# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

    **Plaintiff,**

            **v.**

ALEJANDRO CARRASCO-CASTILLO,

    **Defendant.**

**Criminal No.** 14-423 (FAB)

## OPINION AND ORDER

BESOSA, District Judge.

Before the Court is defendant Alejandro Carrasco-Castillo ("Carrasco")'s motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 ("Rule 29"). (Docket No. 394.) For the reasons set forth below, Carrasco's Rule 29 motion is **DENIED**.

## I.    Background

On July 8, 2014, a grand jury charged Carrasco with soliciting bribes in violation of the Comprehensive Crime Control Act of 1984, 18 U.S.C. section 666 ("section 666," or "Federal Program Bribery") (counts one through four). (Docket No. 3.) After a six-day trial, the jury found Carrasco guilty on all counts. (Docket Nos. 382 and 385.) Carrasco argues, however, that the evidence was insufficient to sustain his conviction. (Docket No. 394.) The Court conveys the facts throughout this Opinion and Order in the

light most favorable to the jury's verdict.  <u>United States v. Rodríguez-Marrero</u>, 390 F.3d 1, 6 (1st Cir. 2004).

Carrasco is an experienced and "well known" attorney. (Docket No. 376 at p. 7.)  Eduard Rivera-Correa ("Rivera"), Sol Luis Fontanes-Olivo ("Fontanes") and Alfredo Alejandro Carrión ("Carrión") are the former mayors of Río Grande, Barceloneta and Juncos, respectively ("mayors"). (Docket No. 375 at p. 31; Docket No. 376 at pp. 7, 10 and 21.)[1]  Carrasco forged personal relationships with Rivera, Fontanes, and Carrión. (Docket No. 375 at p. 31.)  The mayors placed their "total trust" in Carrasco, holding the attorney in high esteem.  <u>Id.</u> at p. 28.

Once Rivera, Fontanes and Carrión assumed office, the municipalities retained Carrasco to represent them in court, offer seminars to government employees, and to provide legal advice regarding, among other matters, contracts and disbursements.  <u>See</u> Trial Ex. 7A (Barceloneta Legal Services Contract), Trial Ex. 19A (Río Grande Contract for Legal Services and Consulting) & Trial Ex. 26A (Juncos Legal Services Contract).  Río Grande and Barceloneta also hired Carrasco as an "independent contractor" to

---

[1] The grand jury also charged Rivera with federal program bribery, attempted extortion, and two counts of obstruction of justice in violation of section 666, 18 U.S.C. § 1951, and 18 U.S.C. § 1512, respectively. (Docket No. 3.) Rivera pled guilty to the section 666 count on October 24, 2014. (Docket Nos. 54 and 59.)  The Court imposed a sentence of 64 months imprisonment, dismissing the remaining counts against Rivera pursuant to Federal Rule of Criminal Procedure 11(c)(1)(A). (Docket No. 65.)

collect taxes and debts, compensating him with "ten percent (10%) of collections made." See Trial Ex. 12A (Barceloneta Professional and Consulting Services Contract) & Trial Ex. 17A (Río Grande Legal and Advisory Services Contract). Carrasco received "hundreds and thousands of dollars" in his capacity as a municipal attorney, a position he held from at least 2008 to 2012. (Draft Transcript at p. 38.)[2]

Juan Carlos Mercado-Torres ("Mercado") is an environmental engineer, specializing in landfill management. (Docket No. 375 at p. 16.) His clients include private companies, developers, and municipalities. Id. at p. 18. Carrasco and Mercado met in 2001 regarding a landfill project in Toa Alta, where Carrasco provided legal services. (Docket No. 376 at p. 5.) The landfill project required Carrasco and Mercado to work closely with each other, ostensibly resulting in a friendship. (Docket No. 376 at p. 7.) Carrasco mentored Mercado and provided legal services to him at no cost. Id. at p. 10. Mercado assisted Carrasco in remodeling his law office and other engineering tasks for no compensation. Id. at p. 15.

---

[2] Court reporters are responsible for promptly filing, when requested, certified transcripts of all proceedings before the Court. 28 U.S.C. § 753. Transcripts are available for a fee. The Court may access preliminary drafts of the transcripts before the official transcript is published. This Opinion and Order cites to a preliminary draft of the transcript.

### A.    The Corrupt Agreement

Mercado initially secured engineering contracts in Río Grande, Barceloneta and Juncos pursuant to legitimate procedures, submitting proposals and engaging in negotiations with government officials.  (Docket No. 375 at pp. 20—28.)  Carrasco assisted Mercado in navigating municipal politics.  Indeed, Carrasco personally requested that Mercado address an infrastructure emergency in Barceloneta and introduced Mercado to Rivera, Fontanes and Carrión.  Id. at p. 25.

The contract procurement process devolved, however, into a corrupt scheme.  The mayor of Juncos stated explicitly to Mercado that he need not pay bribes, requesting only that Mercado "defend the interests of the municipality before the Federal Government" in an environmental dispute.  (Docket No. 376 at p. 29.)  Fontanes, Rivera and Francisco Pumarejo ("Pumarejo"), a city planner in Barceloneta, demanded bribes, however, in exchange for municipal contracts.  Id. at p. 30.  Mercado complied, remitting thousands of dollars to Fontanes, Rivera, and Pumarejo.  (Docket No. 375 at p. 20; Docket No. 376 at p. 45.)[3]

---

[3] On March 7, 2012, a grand jury returned an indictment charging Fontanes, Pumarejo and Juan Antonio San Miguel, "a contractor doing business in Barceloneta," with federal program bribery. (Case No. 12-159, Docket No. 25.) Fontanes pled guilty to two counts of section 666.  Id., Docket No. 118.  The Court imposed a sentence of 120 months imprisonment.  Id.  Pumarejo pled guilty to one count of section 666, receiving a sentence of five-years probation.  Id., Docket No. 103.

Carrasco also solicited bribes from Mercado. (Docket No. 376 at p. 30.) In 2006, Carrasco notified Mercado about the imminent construction of a public square in Río Grande, the "plaza pública" project. Id. The Municipality of Río Grande awarded the plaza pública contract to Mercado, but not before Carrasco demanded a bribe. Id. at p. 32. He questioned Mercado "how much was in there for him," meaning Carrasco expected monetary compensation in return for "protection" and "watching [Mercado's] back." Id. at p. 33.[4] Mercado agreed to "take care of Carrasco" by paying him $500 a month in cash. Id. at pp. 35 and 43. These kickback payments ensured that Mercado would receive the plaza pública contract and prevented Carrasco from disparaging him to Rivera. Id. at p. 36.

The plaza pública project marked the first of several requests for kickback payments. For ongoing projects, Carrasco periodically asked Mercado for "misas sueltas" ("loose change"). Id. at p. 53. Mercado subsequently paid for the "misas sueltas" to Carrasco by check. Id. These checks constituted powerful evidence at trial, demonstrating that thousands of dollars flowed

---

[4] Rivera made similar overtures to Mercado, stating "Juan, you know, I am going to give you this project, but it's going to rain; right?" (Docket No. 376 at p. 44.) Like Carrasco, Rivera wanted "a piece of [Mercado's] contract." Id. Carrasco advised Mercado to satisfy Rivera's demand, cautioning that "the front deck is important. It is priority. Did you keep with the mayor?" Id. at p. 45. Rivera received $1,000 a month from Mercado. Id.

from the three municipalities to Mercado, and ultimately to
Carrasco.  The kickback payments to Carrasco issued shortly after
the municipalities disbursed funds to Mercado.  Id. at p. 64.  For
instance, Mercado paid Carrasco $24,000 by check a month after
entering into a consulting contract with the Municipality of
Barceloneta.  Id.

Mercado and Carrasco devised methods for concealing
their arrangement.  To fabricate a valid justification for the
payments, Mercado wrote fictitious descriptions in the memo line
of his checks to Carrasco.  Id. at p. 62.  To mention one example,
on the $24,000 check for the Barceloneta contract, Mercado marked
"legal fees (personal and commercial)."  Id.  Although Carrasco
occasionally performed legitimate legal services for Mercado, the
check for $24,000 and several others were not to pay for attorney's
fees for work done for Mercado.  Id.  They were bribes.  Id.  This
"trick" equipped Mercado and Carrasco with a plausible explanation
for the checks:  that Carrasco received compensation for legal
services as Mercado's personal attorney.  Id. at p. 63.  The amount
of the kickback payments varied because Mercado and Carrasco
"understood that [they] could not make the checks for the same
amounts" to avoid detection.  Id. at p. 69.  From 2008 through

2011, Mercado paid Carrasco at least $201,980.  Id. at p. 82—86.[5]

A fraction of this amount constituted legitimate legal services.

(Docket No. 377 at pp. 56—57.)  Mercado testified that he paid

$183,000 in bribes to Carrasco.  Id. at p. 57.  The United States

presented evidence that Carrasco received "over $180,000 in

bribes."  (Docket No. 387 at p. 45.)

### B.    Mercado is Arrested

Law enforcement officers arrested Mercado on

February 16, 2012 "for bribes to Francisco Pumarejo."  Docket

No. 362 at p. 37; see Case No. 12-266.[6]  Mercado subsequently

recorded his conversations with Carrasco and Rivera in

coordination with the Federal Bureau of Investigation ("F.B.I.").

(Docket No. 362 at p. 54.)  The United States moved to dismiss the

criminal complaint against Mercado after he completed an eighteen-

month Pretrial Diversion Program.  Id.; see Case No. 12-266, Docket

No. 20.    The Court dismissed the criminal complaint without

prejudice on December 21, 2012 pursuant to Federal Rule of Criminal

Procedure 48.  (Case No. 12-266, Docket No. 22.)

---

[5] Mercado paid Carrasco $14,826, $27,500, $74,624, $85,030 in 2008, 2009, 2010, and 2011, respectively.  (Docket No. 376 at pp. 83—86.)  From January 1, 2009 through March 18, 2012, Mercado received $946,594.47 from Barceloneta, $464,275.00 from Río Grande, and $144,508.21 from Juncos in proceeds from municipal contracts.  (Docket No. 362 at pp. 35—36.)

[6] The United States charged Mercado with one count of federal program bribery in a criminal complaint.  (Case No. 12-266; Docket No. 1.)  Mercado waived the indictment.  Id. Docket No. 15.

The recorded conversations between Mercado and Carrasco confirm that "there was no other justification for those checks other than kickbacks." (Docket No. 362 at p. 80.) Mercado and Carrasco discussed alternative explanations for the checks and expressed fear concerning an F.B.I. investigation, evincing a consciousness of guilt. Id. at p. 70. When Mercado speculated about the consequences of lying to federal agents, Carrasco stated "you're fucked." Id. Carrasco suggested that Mercado invoke the attorney-client privilege to shield the checks from public scrutiny. (Docket No. 377 at p. 10.) Mercado stated: "If I tell the truth, everybody is in trouble." Id. at p. 11. Carrasco answered: "Everyone is you and me." Id. They also referred to the five-year statute of limitations for federal program bribery. Id. at p. 19; see 18 U.S.C. § 3282. Carrasco advised Mercado that the "only way to break this up is for one of us to say this is not for work," and that "[w]e can try to explain the checks one by one." Id. at pp. 22 and 65.

Mercado's testimony, the kickback checks, the recorded conversations and other evidence presented at trial persuaded the jury to find Carrasco guilty. He filed a timely motion for judgment of acquittal. (Docket No. 394.) The United States responded, and Carrasco replied. (Docket Nos. 397 and 399.)

Carrasco's sentencing hearing is scheduled for March 12, 2020. (Docket No. 382.)

## II.  Rule 29 Legal Standard

A court may set aside a jury's guilty verdict and enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction.  See Fed. R. Crim. P. 29. In reviewing a motion for judgment of acquittal, a court must consider the evidence "in the light most favorable to the prosecution" and determine whether the "body of proof, as a whole, has sufficient bite to ground a reasoned conclusion that the government proved each of the elements of the charged crime beyond a reasonable doubt."  United States v. Lara, 181 F.3d 183, 200 (1st Cir. 1999) (citations omitted).

Rule 29 motions require a court to "take into account all evidence, both direct and circumstantial, and [to] resolve evidentiary conflicts and credibility disputes in favor of the jury's verdict."  United States v. Valerio, 676 F.3d 237, 244 (1st Cir. 2012).  The First Circuit Court of Appeals has called this sufficiency of evidence challenge "a tough sell," United States v. Polanco, 634 F.3d 39, 45 (1st Cir. 2011), observing that defendants seeking acquittal on this basis "face an uphill battle."  United States v. Pérez-Meléndez, 599 F.3d 31, 40 (1st Cir. 2010); accord United States v. Hatch, 434 F.3d 1, 4 (1st Cir. 2006) (referring

to the sufficiency of evidence burden as a "daunting hurdle[]")
(internal quotation marks omitted).

While the sufficiency of the evidence is at the heart of the
Rule 29 inquiry, deference to the jury's verdict informs the
Court's analysis.  To uphold the jury's guilty verdict, the Court
need only determine that the conviction "finds support in a
plausible rendition of the record."  See, e.g., United States v.
Shaw, 670 F.3d 360, 362 (1st Cir. 2012).  Ultimately, Carrasco
must establish that "the evidence is so scant that a rational
factfinder could not conclude that the government proved all the
essential elements of the charged crime beyond a reasonable doubt."
United States v. Vázquez-Soto, 939 F.3d 365, 371 (1st Cir. 2019).

## III. Discussion

Congress enacted section 666 to "vindicate significant acts
of theft, fraud, and bribery involving Federal monies which are
distributed to . . . local governments."  S. Rep. No. 225, at 369,
98th Cong., 2d Sess., reprinted in 1984 U.S. Code Cong. & Admin.
News 3182, 3510; see Sabri v. United States, 541 U.S. 600, 606
(2004) (noting that Federal Program Bribery serves to "protect the
integrity of vast sums of money distributed through Federal
programs").  Section 666 prohibits government agents from:

> corruptly solicit[ing] or demand[ing] for the benefit of
> any person, or accept[ing] or agree[ing] to accept,
> anything of value from any person, intending to be

> influenced or rewarded in connection with any business,
> transaction, or series of transactions of [the
> Municipality] involving anything of value of $5,000 or
> more.

18 U.S.C. § 666(a)(1)(B).[7]  To sustain a conviction pursuant to

section 666, the evidence must establish that Carrasco and Mercado

agreed to "exchange something of value for influence over some

official conduct of the recipient." United States v. Gracie, 731

F.3d 1, 3 (1st Cir. 2013); United States v. Fernández, 733 F.3d 1,

22 (1st Cir. 2013) ("[F]or bribery, there must be a *quid pro quo*

– a specific intent to give or receive something of value in

exchange for an official act.").

Carrasco challenges his conviction on four grounds. (Docket

No. 394.)  First, Carrasco asserts that no reasonable juror could

find that he qualified as an "agent" within the meaning of section

666. Id. at p. 3.  Second, he argues that the absence of "corrupt

intent to be influenced in official acts as charged in the

indictment" warrants judgment of acquittal. Id. at p. 12.  Third,

Carrasco maintains that the record is devoid of evidence

establishing that he performed an official act. Id. at p. 7.

---

[7] Section 666 applies to agents of an "organization, government, or agency
[that] receives, in any one year period, benefits in excess of $10,000 under a
Federal program." 18 U.S.C. § 666(b).  Jorge Allende-Santos, an employee of
the United States Department of Housing and Urban Development, testified at
trial that from 2009 through 2012 Barceloneta, Río Grande, and Juncos received
more than $10,000 in federal benefits for low income households. (Docket
No. 378 at pp. 70-78.)

Fourth, he purports that the payments he received from Mercado were gratuities rather than bribes. Id. at p. 12.

### A. Carrasco is an Agent Pursuant to Section 666

The indictment classifies Carrasco as an "agent" of Barceloneta, Río Grande and Juncos. (Docket No. 3.) This designation is significant because the charge of conviction applies only to agents of federally funded government entities or organizations. 18 U.S.C. § 666(a)(1); see United States v. Philip, 219 F.3d 404, 413 (5th Cir. 2000) ("Without an agency relationship to the recipient of federal funds, § 666 does not reach the misconduct of local officials."). Section 666 defines "agent" as:

> [any] person authorized to act on behalf of another person or government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative.

18 U.S.C. § 666(d)(1); see United States v. Vitillo, 490 F.3d 314, 323 (3d Cir. 2007) (holding that "as a matter of statutory interpretation, § 666(d)(1) does not by definition exclude an independent contractor who acts on behalf of a § 666(b) entity as a manager or representative of that entity"). Carrasco avers that he merely served as "outside legal counsel," not as an agent of the municipalities. (Docket No. 394 at p. 4.) The Court disagrees.

The First Circuit Court of Appeals has adopted a broad interpretation of section 666. See Rohit Nath, Corruption Clarified: Defining the Reach of "Agent" in 18 U.S.C. § 666, 80 U. Chi. L. Rev. 1391 (2013) (discussing and distinguishing the various interpretations of "agent" among federal courts). In United States v. Sotomayor-Vázquez, Yamil Kouri-Pérez ("Kouri") acted as the de facto "director, manager, and representative" of Advanced Community Health Services, Inc. ("ACHS"), a federally funded organization. 249 F.3d 1, 6 (1st Cir. 2001). Despite Kouri's extensive involvement in the organization, he was not an official ACHS employee, nor was he on the ACHS payroll. Id. Kouri moved for judgment of acquittal because the United States purportedly failed to prove he was an "agent" within the meaning of section 666. Id. at 8. According to Kouri, "he was not authorized to act on behalf of ACHS" and assisted the organization only in his capacity as an "outside consultant." Id. The Sotomayor court rejected this narrow application of Federal Program Bribery, holding that an "outside consultant with significant managerial responsibility poses as significant a threat to the integrity of federal funds as a manager actually employed by the agency in question." Id. Kouri's Rule 29 motion proved futile because a rational jury could "find beyond a reasonable doubt that [he] was

an 'agent' of ACHS for purposes of 18 U.S.C. § 666(d)(1)." Id. at 9.

Unlike Kouri and ACHS, Carrasco and the municipalities memorialized their employment agreements. Counts one and four concern bribes that occurred in Barceloneta from July 2009 through August 2009 and "[f]rom in or around July 2011," respectively. (Docket No. 3.) Count two pertains to bribery that occurred in Río Grande from March 2010 through July 2010. Id. Count three alleges that Carrasco was "an agent and representative of the Municipality of Juncos" from August 2010 through October 2016. Id.[8] The contracts between Carrasco and the municipalities were admitted at trial during the testimony of Carlos Pérez-Rivera ("Pérez"), a documents administrator for the PROC. (Draft

---

[8] Counts one and three are governed by the "Legal Services Contract[s]" in effect between July 1, 2009 through June 30, 2010, and from July 1, 2011 through June 30, 2012. Trial Exs. 11A and 15A. The relevant agreements for count two are the "Contract[s] for Legal Services and Consulting" that were in effect from July 1, 2009 through June 30, 2011. Trial Exs. 18A, 19A and 21A. For count three, the "Legal Services Contract" in effect from July 1, 2010 through June 30, 2011 is controlling. Trial Ex. 27A.

Transcript.)[9]  These contracts solidify Carrasco's status as an agent.[10]

Carrasco and Barceloneta entered into multiple "Legal Services Contract[s]." Trial Exs. 11A, 12A, 13A and 15A. Pursuant to these contracts, Carrasco agreed to:  (1) "represent [Barceloneta] in the Courts of Puerto Rico on any matter [Fontanes, in his capacity as mayor], refer[ed] to him," (2) advise Barceloneta regarding "drafts of audit reports submitted for comments by the PROC," (3) prepare action plans and intervention reports for the PROC, (4) evaluate "operational areas . . . such as Budget, Accounting, Disbursements, Contracts, Personnel, Purchases, Bids, and other related aspects for the purpose of informing about their condition and recommending corrective measures," (5) "meet regularly with municipality's officials,"

---

[9] The Legal Services Agreement between Carrasco and Barceloneta contains a typographical error. Trial Ex. 11A.  Provision 12 provides that the "contract will become effective and have legal effects between the parties from January 13, 2009 to June 30, 2009.  Trial. E. 11A at p. 4.  The original contract, however, states that:  "Este contrato entrará en vigor y tendrá efectos legales entre las partes desde el 1 de julio de 2009, hasta el día 30 de junio de 2010," meaning that the contract was in effect from July 1, 2009 through June 30, 2010.  Trial Ex. 11.  At trial, Pérez referred to the correct dates, stating that the Legal Services Agreement was in effect from "July 1, 2009 through June 30." (Draft Transcript at pp. 22-23.) Construing the evidence in the light most favorable to the verdict, the Court presumes that the jury relied on Pérez's testimony rather than the incorrect English translation.

[10] The contracts cite the Autonomous Municipalities Law of 1991, "Law 81." Trial Exs. 7A—28A; P.R. Laws Ann. tit. 21, § 4551.  Law 81 provides that "the municipalities may contract the services of private consultants specialized in personnel administration when their needs require it and their fiscal resources allow it." Id.

(6) "represent [Barceloneta] in the administrative and investigative agencies," (7) provide seminars to municipal officials, and (8) "act as the Examining Official at administrative hearings." Trial Ex. 11A at pp. 1—2. Carrasco received $125 an hour for his legal services. Id. at p. 2. The Barceloneta contracts provide that "there is no employer-employee relationship between [Carrasco and the Municipality], except for income taxes." Id. at p. 3.

The agreements with Río Grande and Juncos are nearly identical, requiring Carrasco to represent the municipalities in court and before administrative agencies, evaluate contracts, offer seminars, and to complete tasks assigned by the mayors. (Trial Exs. 19A, 21A and 27A.)

Carrasco relies on a misguided and overly restrictive interpretation of the Sotomayor decision. Docket No. 394 (citing 249 F.3d 1). According to Carrasco, the First Circuit Court of Appeals held that agents "include either direct employees of the covered entities or outside consultants only when they had managerial responsibility or had acted as officers or directors of the covered entity." Id. at p. 3. This binary standard is unfounded. The dispositive inquiry is whether the putative agent "represents the agency in any way." Sotomayor, 249 F.3d at 8 (citing United States v. Philips, 219 F.3d 414, 422 n.28 (5th Cir.

2000) (Garza, J., dissenting).  Section 666 is devoid of any
requirement that an outside consultant possess managerial
authority to qualify as an agent.  The Sotomayor court considered
Kouri's involvement in ACHS in the absence of a formal employment
relationship, holding that a reasonable jury could find that he
qualified as an agent.  Id.  Managerial responsibilities proved
sufficient, but not necessary, to place him within the ambit of
section 666.  See United States v. Hudson, 491 F.3d 590, 595 (6th
Cir. 2007) (holding that labels employed by contracting parties
"may bring some employment relationships *within* the sphere of
agency status but they do not necessarily squeeze all other
employment relationships *out* of that sphere").

        Carrasco's contracts with the municipalities are
explicit manifestations of his status as an agent.  Indeed, the
evidence presented at Carrasco's trial is more concrete and
persuasive than the evidence in Sotomayor because the jury relied
on the memorialized agreements and Mercado's testimony that "[h]e
was the attorney for the Municipalities."  (Docket No. 375 at
p. 26.)  Appearing on behalf of Río Grande, Barceloneta, and Juncos
in court is a quintessential form of representation, equipping the
jury with a sufficient basis to find that Carrasco is an "agent"
pursuant to section 666.  See United States v. Mosberg, 866 F.
Supp. 2d 275, 307 (D.N.J. 2011) (holding that an indictment

sufficiently charged a township attorney as an "agent" pursuant to section 666 because his duties included "preparing reports and providing advice, representing the Planning Board in litigation and mediation, drafting resolutions, and attending meetings and interacting with the Township administration").[11]

Although the Río Grande agreements stipulated that "there is no employer-employee relationship," the statutory text in section 666 controls the Court's analysis, not common law principles of agency.  See, e.g., United States v. Lupton, 620 F.3d 790, 800 (7th Cir. 2010) (holding that an independent contractor was an agent pursuant to section 666 despite contractual provision prohibiting him from acting "as an officer, employee, or agent of the state" because agency is "determined by [the statute], not by the terms of a private contract").  Consequently, Carrasco is an agent pursuant to section 666 despite contractual language to the contrary.

Evidence of Carrasco's role as a municipal attorney belies the proposition that he is not an "agent" pursuant to

---

[11] See also Campbell v. United States, Case No. 12-20054, 2016 U.S. Dist. LEXIS 83386 *2, 18 (E.D. Mich. June 28, 2016) (finding that a "services vendor for the Detroit Public Schools (DPS) in a bookkeeping capacity" qualified as an agent pursuant to section 666 because she "was authorized to act on behalf of the school, and that she did in fact act on their behalf, in the execution of her duties"); United States v. McDowell, Case No. 12-107, 2013 U.S. Dist. LEXIS 133831 *4-5 (M.D. Ala. Sept. 19, 2013) (holding that although an individual was not a government employee, he nevertheless qualified as an "agent" within the meaning of section 666 because he "had significant involvement with and influence over the decision-making process").

section 666.  See, e.g., United States v. Percoco, Case No. 16-
776, 2017 U.S. Dist. LEXIS 203580 *26 (S.D.N.Y. Dec. 11, 2017)
(holding that defendant qualified as an agent pursuant to section
666 because he "function[ed] in a senior advisory and supervisory
role with regard to the Governor's Office, and continued to be
involved in hiring of staff and the coordination of the Governor's
official events and priorities"); Hudson, 491 F.3d at 594 (holding
that an independent contractor hired by a school district to "help
it develop a television station" qualified as an agent pursuant to
section 666 because "two contracts gave [him] broad authority .
. . to perform all duties, responsibilities and necessary actions
required to market, develop and consult in the development of the
[television station]").  Consequently, Carrasco remains subject to
criminal liability pursuant to section 666.

        **B.   Corrupt Intent**

        According to Carrasco, the jury misapprehended the *mens
rea* requirement in section 666.  (Docket No. 394 at p. 9.)  He
argues that "jurors are lay people on whom such distinctions and
nuances are not always clear in the context of a criminal trial."
Id.  A randomly selected contingent of Carrasco's peers responded
to the jury summons, participated in *voir dire*, took an oath to
review the evidence impartially and without bias, and rendered a
verdict.  Disagreement with that verdict is not a basis to dismiss

the jury's competence or insinuate a lack of sophistication. Juries are a bedrock of the judicial system, capable of adjudicating complex cases and determining culpability in criminal actions. <u>See</u> <u>United States v. Brown</u>, 381 U.S. 437, 445 (1965) (noting that juries are "well suited . . . to the task of ruling upon the blameworthiness of, and levying appropriate punishment upon, specific persons"). A juror need not possess specialized knowledge to infer that requesting "misas sueltas," accepting thousands of dollars from a contractor for dubious reasons, attempting to manufacture narratives to explain kickback checks, analyzing the statute of limitations for Federal Program Bribery, and asking "how much is in it for me?" is indicative of bribery.

Carrasco argues that "[n]o reasonable juror should confuse Mercado's perception with an intent by Carrasco to be influenced." (Docket No. 394 at p. 9.) In Carrasco's closing argument, defense counsel asserted that "Mercado is a liar [and] a conman." (Docket No. 387 at p. 82.) Defense counsel also alleged that Mercado cooperated with the United States for immunity and "planned what his testimony would be before [the jury] in this Court." <u>Id.</u> at p. 84. Credibility assessments are within the province of the jury. <u>United States v. Santos-Soto</u>, 799 F.3d 49, 57 (1st Cir. 2015) ("We do not assess the credibility of a witness, as that is the role reserved for the jury."). The jury considered

defense counsel's arguments regarding Mercado's credibility and observed his testimony in court, concluding that the evidence warranted a guilty verdict. The Court will not usurp the jury's credibility assessments.

## C. Official Act

Carrasco challenges his conviction by modifying the elements of section 666 and misinterpreting the statute. He asserts that the United States failed to demonstrate that he "[provided] protection to Mercado," or "[took] any steps to interfere with his contracts." (Docket No. 394 at p. 8.) Federal Program Bribery is triggered by a *quid pro quo* agreement, irrespective of whether an agent performs official acts in furtherance of the corrupt scheme. United States v. Pretty, 98 F.3d 1214, 1219 (10th Cir. 1996) (holding that section 666 "requires only intent to be influenced, rather than actual influence"); United States v. Suhl, 885 F.3d 1106, 1115 (8th Cir. 2018) (holding that "it is not necessary for the government [in a federal program bribery prosecution] to link any particular payment to any particular action undertaken by the government agent, and the bribe may be paid with the intent to influence a general course of conduct") (internal citation and quotation omitted). Carrasco violated section 666 by agreeing to be influenced, regardless of whether he in fact granted "access" to

municipal contracts or "watched [Mercado's] back." (Docket No. 375 at p. 30.)

Carrasco contends that his conviction cannot stand because he lacked "any authority" to award municipal contracts. (Docket No. 394 at p. 4.) The authority to allocate federal funds is not, however, an element of section 666. United States v. Fernández, 722 F.3d 1, 11 (1st Cir. 2013) ("Even if the officials accepting bribes do not have the ability to control the expenditure of an entity's funds, 'it cannot be denied that their fraudulent conduct poses a threat to the integrity of the entity, which in turn poses a threat to the federal funds entrusted to that entity.") (citing United States v. Keen, 676 F.3d 981, 989-99 (11th Cir. 2012) ("Nowhere does the statutory text [of section 666] either mention or imply an additional qualifying requirement that the person be authorized to act specifically with respect to the entity's funds.")). Restricting the scope of section 666 to those who control federal funds would expose the public fisc to corruption by employees who wield influence but lack final decision-making authority. See United States v. Andrews, 681 F.3d 509, 530 (3d Cir. 2012) (holding that a special assistant to the Virgin Islands governor qualified as an agent pursuant to section 666 even though he "did not have to possess actual authority over the business, transaction, or series of

transactions, that [a contractor] sought to influence"). Accordingly, Carrasco's official acts argument is meritless.

### D.    The Evidence Established a *Quid Pro Quo* Agreement

Carrasco maintains that the payments he received from Mercado were gratuities rather than bribes. (Docket No. 394 at p. 18.)  The First Circuit Court of Appeals has held that "gratuities are not criminalized under § 666." Fernández, 722 F.2d at 23.  In United States v. Sun-Diamond Growers, the United States Supreme Court held unanimously that "[t]he distinguishing feature of each crime is its intent element.  Bribery requires intent 'to influence' an official act or 'to be influenced' in an official act." 526 U.S. 408, 412 (1999).  In contrast, a gratuity is conveyed exclusively as a "reward," not to influence the recipient.  Fernández, 722 F.3d at 19 (citation omitted). Accordingly, "the timing of the payment in relation to the official act for which it is made is (in theory) irrelevant." United States v. Jennings, 160 F.3d 1006, 1014 (4th Cir. 1998).

The First Circuit Court of Appeals further clarified that "the essential difference between a bribe and an illegal gratuity is the intention of the bribe giver to effect a *quid pro quo*." United States v. Mariano, 983 F.2d 1150, 1159 (1st Cir. 1993).  In sustaining a section 666 conviction, the Fourth Circuit Court of Appeals specified that "the payor of a bribe must intend

to engage in some 'more or less *quid pro quo*' with the official
who receives the payment."   Jennings, 160 F.3d 1106, 1011 (4th
Cir. 1998).   In the gratuity context, "offenders give the gift
without attaching any strings, intending it instead as a reward
for action the public official has already taken or is already
committed to take."   Mariano, 983 F.2d at 1159.

     Carrasco   purports   that   the   evidence   failed   to
demonstrate "whether any ensuing payment(s) to [him] were bribes
or gratuities because "the [uncertain] timing of the alleged
agreement in relation to the contracts."   (Docket No. 394 at
p. 18.)   When Carrasco first requested a bribe from Mercado,
however, he did so **before** Mercado received the plaza pública
contract.   (Docket No. 375 at p. 35) (emphasis added).
Subsequently, Carrasco demanded bribes "to continue collecting
recurrently based on [Mercado's contracts]."   Id. at pp. 51-52;
see United States v. Ganim, 510 F.3d 134, 142 (2d Cir. 2007)
("[T]he requisite *quid pro quo* for [section 666] may be satisfied
upon a showing that a government official received a benefit in
exchange for his promise to perform official acts or to perform
such acts as the opportunities arise.").   Mercado convinced
Carrasco to accept $24,000 for a "big contract" in Juncos, the
municipality subsequently awarded Mercado the contract, and
Carrasco received a kickback.   Id. at pp. 60-64.   The First Circuit

Court of Appeals has explained that "a bribe can be promised before, but paid after, the official's action on the payor's behalf." Fernández, 722 F.3d at 23.  Although Mercado issued the kickback checks after receiving the municipal contracts, the *quid pro quo* agreement between him and Carrasco occurred beforehand. Accordingly, the kickback payments were bribes intended to influence Carrasco rather than rewards for beneficial acts (gratuities).

## IV.  Conclusion

For the reasons set forth above, Carrasco's motion for judgment of acquittal is **DENIED**.  (Docket No. 394.)

**IT IS SO ORDERED**.

San Juan, Puerto Rico, February 26, 2020.

s/ Francisco A. Besosa
FRANCISCO A. BESOSA
UNITED STATES DISTRICT JUDGE